# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                               :

**THE UNITED STATES OF AMERICA**
*ex rel.* **(UNDER SEAL),**          :
                               :

              **Plaintiff,**         :
                               :     **Civil No. _____**

           **v.**                 :
                               :

**(UNDER SEAL)**               :
                               :

             **Defendant.**       :
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## DO NOT ENTER IN ECF/PACER

## DO NOT PUT IN PRESS BOX

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |  |
|---|---|---|
| | : | |
| **THE UNITED STATES OF AMERICA** | : | |
| *ex rel.* **KELAND O. HARRISON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil No. _____** |
| **v.** | : | |
| | : | **FILED *IN CAMERA* AND** |
| **OMEGA PROTEIN CORP. and** | : | **UNDER SEAL** |
| **OMEGA PROTEIN, INC.** | : | **31 U.S.C. § 3730(b)(2)** |
| | : | |
| **Defendants.** | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

COMES NOW, through the undersigned counsel, Relator Keland O. Harrison, on behalf of himself and the United States of America ("United States"), brings this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), the Act to Prevent Pollution from Ships, 33 U.S.C. §§ 1901 *et seq.* (the "APPS"), the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* (the "CWA"), and Louisiana's Environmental Whistleblower Statute, La. Rev. Stat. 30:2027, to recover monetary damages, civil penalties, and other remedies for violations of the Federal environmental laws and regulations, and Louisiana whistleblower protection laws.

Relator hereby alleges as follows:

**I.    NATURE OF THE ACTION.**

1.    This is a *qui tam* action under the federal and state False Claims Acts, the federal Act to Prevent Pollution from Ships, the federal Clean Water Act, and Louisiana's

Environmental Whistleblower Statute.  The False Claims Act was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War."  132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman).  The law allows a private person with knowledge of a fraud to bring an action in federal district court for himself and for the United States and States and to share in any recovery.  The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

2.      The APPS was enacted in 1980 to implement the United States' obligations under the International Convention for the Prevention of Pollution from Ships ("MARPOL").  MARPOL includes 6 Annexes ("MARPOL Protocol"), which regulate numerous types of discharges from ships, including oil (Annex I).  Under APPS, violations of the MARPOL Protocol or the regulations promulgated under APPS are violations of federal law.  APPS allows individuals to bring private actions against violators.  APPS also allows people providing information to the Government, like the Relator here, to share in both civil and criminal recoveries that the Government obtains based on that information.

3.      The CWA establishes the basic structure for regulating discharges of pollutants into the waters of the United States and regulating quality standards for surface waters.  The basis of the CWA was enacted in 1948 and was called the Federal Water Pollution Control Act, but the Act was significantly reorganized and expanded in 1972.  "Clean Water Act" became the Act's common name with amendments in 1972.  Under the CWA, it is unlawful to discharge any pollutant from a point source into the navigable waters of the United States without a permit.

4.    Louisiana's Environmental Whistleblower Statute, La. Rev. Stat. 30:2027, was enacted in 1991 and prohibits employers from acting in a retaliatory manner against any employee that reports violations of environmental law, rule, or regulation to superiors or a public body.  Under this statute, the employee need only have a reasonable belief that the reported conduct violations either federal, state, or local laws to be protected from retaliation.

5.    In this *qui tam*, Relator alleges that Defendants knowingly made and caused to be made false statements and claims that were material to the government's decision to provide $10,000,000 under a loan agreement with Defendant Omega Protein, Inc. ("OPI") and guaranteed by Omega Protein Corporation ("OME").  Specifically, Defendants certified that they were operating in compliance with all applicable state and federal environmental laws and regulations.  In fact, Defendants continuously and systematically disregarded and evaded numerous environmental laws such as APPS, CWA, and others. Defendant's false certifications about compliance with environmental laws were material to the United States' decision to enter into the loan agreement and provide OPI money in violation of the False Claims Act.

6.    Defendant OME is the leading vertically-integrated domestic producer of Omega-3 rich fish oil, protein-rich specialty fishmeal, and organic fish solubles for livestock and aquaculture feed manufacturers.  Defendant OPI is the primary operating subsidiary of OME, and OME is actively involved in the management of OPI.  OPI operates a fleet of fishing vessels that harvest menhaden and deliver their catch to OPI processing facilities, including the one near Abbeville, Louisiana.  OPI then processes the fish and produces the fish oil, fish solubles, and specialty fish meals for sale to the public.

## II.    <u>JURISDICTION AND VENUE</u>.

7.    This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relator seeks remedies on behalf of the United States for Defendants' violations of 31 U.S.C. § 3729, some of which occurred in the Western District of Louisiana, and the Defendant transacts substantial business within the Western District of Louisiana.

8.    This Court may exercise personal jurisdiction over Defendants under La. Rev. Stat. §§ 13:3201(A)(1), (3), (4), and (5).

9.    This Court has pendant jurisdiction over the State claims pursuant to 31 U.S.C. § 3732(b) and 31 U.S.C. § 3730(e).

10.    This Complaint has been timely filed within the period prescribed by 31 U.S.C. § 3731(b).  The allegations and transactions set forth in this Complaint have not been publicly disclosed prior to filing, in accordance with 31 U.S.C. § 3730(e).

11.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1391(b) and (c), 33 U.S.C. § 1365(c), and 33 U.S.C. §§ 1910(c)(1) and (3) because the Defendant resides, transacts business, and/or is qualified to do business in this District, pollutant discharges occurred in this District, and its port facility and ships are located or may be found in this District.

## III.    <u>PARTIES</u>.

### A.    Plaintiffs.

12.    Plaintiff United States of America brings this action by and through its administrative agency, the United States Department of Commerce ("Commerce"), which is responsible for administering the Fisheries Finance Program ("FFP") under Title XI of

the Merchant Marine Act of 1936, as amended ("Title XI").  At all times relevant to this Complaint, the United States funded the loans provided under Title XI.

**B.      Relator (FCA) & Plaintiff (APPS, CWA, and La. Rev. Stat. § 30:2027).**

13.     Relator Keland O. Harrison graduated from Everest College with a diploma in Massage Therapy in 2009.  Relator was hired on a seasonal basis in April 2013 by OPI at its Abbeville, Louisiana fish processing plant ("Abbeville Plant").  Relator initially worked as a raw box operator, which involves pumping fish off Omega boats to a "raw box," from which Relator later pumped harvested fish to cookers.  In January 2014, OPI hired Relator on a full-time basis as the overnight evaporator operator, where his responsibilities included making solubles to bind to fish meal product produced at the plant.  OPI terminated Relator in June 2015 after he identified the theft of certain OME and/or OPI property by other employees at the Abbeville Plant, as well as numerous environmental violations to his supervisors.

14.     In his job at the Abbeville Plant, Relator witnessed numerous instances of OME and/or OPI employees engaging in the conduct alleged herein.  Pursuant to 31 U.S.C. § 3730(e)(4)(B), Mr. Harrison is the "original source" of the information given to the United States regarding Defendant's illegal conduct in violation of Federal and State laws.  He has direct and independent knowledge of the allegations set forth herein and states that the information concerning Defendants' misconduct was not disclosed publicly prior to his disclosure to the United States.  Pursuant to 33 U.S.C. §§ 1908(a) and (b), Mr. Harrison is the person giving information to the United States leading to conviction and criminal penalties, as well as civil penalties, assessed against OME and OPI.

15.    OPI's pollution of the Vermilion River and Vermilion Bay prohibit Relator's recreational use and enjoyment of those bodies of water.  Further, Relator's attempts to report OPI's environmental violations to his superiors resulted in OPI firing him.

**C.    Defendants**.

16.    Defendant OME is the leading vertically-integrated domestic producer of Omega-3 rich fish oil, protein-rich specialty fishmeal, and organic fish solubles for livestock and aquaculture feed manufacturers.

17.    OME is organized and existing under the laws of Nevada with its principal place of business located at 2105 City West Boulevard, Suite 500, Houston, Texas 77042. It may be served through its registered agent at The Corporation Trust Company of Nevada, 701 South Carson Street, Suite 200, Carson City, Nevada 89701.

18.    Defendant OPI, a wholly-owned subsidiary of OME, is the primary operating subsidiary of OME.  OPI is organized and existing under the laws of Virginia with its principal place of business located at 2105 City West Boulevard, Suite 500, Houston, Texas 77042.  It may be served through its registered agent at CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

19.    OME, through its integrated corporate structure, oversees the day-to-day operations of OPI with respect to its environmental compliance at the Abbeville Plant. As detailed below, OME's Chief Executive Officer Bret Scholtes personally inspected the Abbeville Plant at the start of the 2015 menhaden season.  Similarly, when Relator reported OPI's environmental violations to OME's corporate ethics hotline, which is the designated means for OPI employees to report such violations, and raised concerns with Mr. Scholtes, it was OME's Vice President of Operations Monte Deihl that met with

Relator.  Therefore, OPI may be deemed the agent of OME and, as such, both OPI and OME may be held liable for the wrongful conduct alleged herein.  Additionally, through OME's integrated corporate structure, OPI performs business functions, including the harvesting and processing of menhaden, the operation of the Abbeville Plant, and the wrongful conduct described herein, that are compatible with and assist OME's business, such that both OME and OPI may be held liable for the wrongful conduct alleged herein.

20.    OPI operates a fleet of fishing vessels in the Gulf of Mexico largely based at the Abbeville Plant and in the Atlantic Ocean based in Reedville, Virginia that harvest menhaden and deliver their catch to OPI processing facilities, including the Abbeville Plant in Vermilion Parish near Abbeville, Louisiana.  OPI then processes the fish and produces the fish oil, fish solubles, and specialty fish meals for sale to the public.

21.    OPI has been on probation since June 4, 2013, when it entered into a plea agreement with the United States regarding its operations in Virginia and paid a $5,500,000 fine.  OPI pled guilty to two counts charging numerous violations of the CWA in and near the Chesapeake Bay in Virginia.  Specifically, OPI pled guilty to one count of knowingly discharging pollutants on numerous discrete occasions into United States waters without a permit in violation of the CWA.  OPI also pled guilty to one count of knowingly discharging oil into United States waters on numerous, discrete occasions.  As part of its plea agreement and probation, OPI was required to develop and implement an Environmental Management System for all of its facilities, including the Abbeville Plant, and agree to an outside monitor.  Also under the terms of its Plea Agreement, "[n]o employee may be terminated or otherwise retaliated against for reporting deficiencies" through the company's hotline.

IV.    **THE LEGAL FRAMEWORK**.

A.    **The False Claims Act**

22.    The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made to the United States; or (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil money penalty plus treble damages.  31 U.S.C. §§ 3729(a)(1)(A)-(B), (G).

23.    The False Claims Act also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty plus treble damages.  31 U.S.C. § 3729(a)(1)(C).

24.    The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1)(B).

25.    The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the

money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. §§ 3729(b)(2)(A)(i)-(ii).

26.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.   31 U.S.C. §§ 3729(b)(4).

27.     The States have enacted false claims statutes, the provisions of which substantially mirror the Federal FCA provided in preceding paragraphs.  Relator asserts claims under the statutes enacted by the States for the State grants awarded based on the false claims as stated herein.  Relator's disclosure of substantially all material evidence and information Relator possesses will be served upon State officials as required by State law.

      **B.**     **The Clean Water Act**

28.     The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, prohibits the knowing or negligent discharge of pollutants from a point source into the waters of the United States without a permit.  When a vessel is in the navigable waters of the United States, which includes the territorial seas, it is considered a point source.  There is an exception under the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. § 1401 *et seq.*, that allows "fish waste" to be discharged without a permit from a vessel that is at least three nautical miles from the baseline from which the territorial sea is measured (i.e. three miles from shore).

29.    The Clean Water Act authorizes the issuance of permits to allow the discharge of otherwise unlawful quantities of pollutants under the National Pollutant Discharge Elimination System ("NPDES").  Further, if states obtain approval from the U.S. Environmental Protection Agency, the states may also issue permits to allow discharges within their state as long as the permits meet the requirements of the Clean Water Act. Louisiana has obtained such approval and issues permits under the Louisiana Pollutant Discharge Elimination System ("LPDES").

30.    Under the Clean Water Act, it is a crime to knowingly or grossly negligently discharge a harmful quantity of oil into or upon the navigable waters of the United States or adjoining shorelines.  For the purposes of the Clean Water Act, oil includes diesel fuel. An oil discharge is considered to be a harmful quantity if it produces a visible sheen on the surface of the water.

31.    In the event that the person in charge of a vessel or of an onshore facility knows of the discharge of oil or other hazardous substance into the United States' waters, that person must immediately notify the appropriate agency of the United States Government of such discharge.  It is also unlawful to knowingly make any false material statement, representation, or certification in any report or other document filed or required to be maintained under the Clean Water Act.

32.    The Clean Water Act authorizes private citizens, like Relator, that have an interest that may be impacted by to bring a civil action on his own behalf against any person violating effluent discharge standards or limitations.  The private plaintiff must provide 60 days' notice to the U.S. Environmental Protection Agency Administrator, the State in which the violation(s) occurred, and the alleged violator.  Relator has done so.

Relator reported the environmental violations at the Abbeville Plant to the Louisiana Attorney General's Office in discussions on March 9 & 10, 2015. Relator met with Special Investigators from the U.S. Environmental Protection Agency on December 8, 2015, and provided detailed information about the environmental violations at the Abbeville Plant. The U.S. Environmental Protection Agency is currently investigating the conduct alleged herein. As detailed below, Relator called OME's hotline and reported the environmental violations at the Abbeville Plant on March 16 & 17, 2015. OME's human resources staff questioned Relator about his reports to the OME hotline.

### C.    The Act to Prevent Pollution from Ships

33.    The Act to Prevent Pollution from Ships, 33 U.S.C. § 1901 *et seq.*, implements the International Convention for the Prevention of Pollution from Ships, 1973, and its Protocol of 1978, which is commonly referred to as "MARPOL". MARPOL is the main international convention regarding the prevention of pollution of the marine environment by ships from operational or accidental causes. The Act to Prevent Pollution from Ships requires that any U.S.-flagged vessel that is not an oil tanker that operates more than 12 miles from shore and displaces 400 gross tons or more must maintain an Oil Record Book. In the event of an emergency, accidental, or other exceptional discharge of oil or of an oily mixture, an entry must be made in the Oil Record Book indicating the circumstances of, and the reasons for, the discharge. This recording requirement applies regardless of where the vessel is located when the discharge takes place.

34.    The knowing violation of the Act to Prevent Pollution from Ships, the MARPOL Protocol, or the regulations promulgated thereunder is a class D felony. The court may also award up to ½ of a criminal fine to the person giving information leading

to conviction.  The Act to Prevent Pollution from Ships also allows for civil penalties against violators, the court may award up to ½ of civil penalties to the person giving information leading to the assessment of such penalties.

35.    The Act to Prevent Pollution from Ships includes a private right of action against any person alleged to be in violation of the provisions of the Act to Prevent Pollution from Ships or the regulations issued thereunder.  The court may award litigation costs to any party, including attorneys' fees and expert witness costs.

**D.    Louisiana Revised Statutes 30:2027.**

36.    Louisiana prohibits employers from retaliating against employees who report environmental violations.  No employer may retaliate against an employee who, acting in good faith, discloses to a supervisor or public body any activity or practice of the employer that the employee reasonably believes violates an environmental law, rule, or regulation.

37.    Any employee that is fired in violation of this prohibition may bring an action against his former employer and recover from his employer triple damages resulting from the action taken against him, as well as costs and attorneys' fees.

**V.    BACKGROUND ON MENHADEN PROCESSING**

38.    Menhaden season in the Gulf of Mexico runs from mid-April through mid-October each year.

39.    The fishing and processing of menhaden generates several types of pollutants, the disposal of which is strictly regulated by state and federal laws.

40.    "Bail Water" is fresh water that is pumped into the holds of fishing vessels to "bail" the fish from the vessel into the processing plant.  This water often accumulates fish waste such as scales, fins, and excrement.  Bail water also is circulated through the

processing plant and mixed with pollutants that were generated during processing, as well as a caustic substance used to clean the processing equipment. Discharge of bail water into United States waters is prohibited under the Clean Water Act unless done more than three nautical miles from shore.

41.    Bail water includes a number of potentially harmful pollutants, including:

a)    Oil and Grease, which can have immediate and long-term adverse effects on both surface and subsurface animal species. Fish, cetaceans, Mollusca, and crustaceans experience harmful and often deadly consequences by becoming tainted after coming into contact with waterborne oil. Shellfish species are filter feeders, and thus have no means to avoid intake of oil into their systems – thereby poisoning or killing those species. Fish and fish eggs experience toxic illness and death from exposure to petroleum products including diesel, gasoline and oil. Whales and dolphins are harmed by oil exposure as well. Both may experience skin irritation and serious respiratory issues from inhalation of oil vapors at the surface. Birds and other surface animals can be harmed or killed when oil sticks to their bodies, in the case of birds matting their feathers. Marine mammals and birds can be poisoned by inadvertently ingesting oil when swimming through or attempting to clean themselves after they have been exposed to oil.

b)    Phosphorus and Nitrogen in excess levels result in rapid algae growth, beyond what ecosystems can naturally handle. Large increases in algae growth can negatively impact water quality and the oxygen levels required to maintain sea life in a stream, river, lake, bay, or coastal area. Such increases can lead to illness and death of fish populations, and result in elevated toxins and bacterial

growth, which can harm persons who come into contact with polluted water.

c)      Organic substances high in Biochemical Oxygen demand such as excrement, detergents, and fats deplete oxygen levels in the water, which can kill sea life and harm the marine ecosystem.

d)      Polychlorinated Biphenyls ("PCBs") are stable molecules that do not easily degrade and thus remain in the environment long after release.  They do not evaporate nor do they easily dissolve in water.  In marine ecosystems, PCBs can be dispersed great distances and be buried in sediments.  Furthermore, they can be absorbed, ingested or inhaled by animals and subsequently build in fatty tissues, which ultimately leads to adverse health effects.  Sulfuric Acid raises the acidity of the water, which can harm animal and plant life.

e)      Caustic Soda can cause toxic reactions in humans when ingested through drinking water contamination.  When caustic soda is mixed with water it can generate such heat as to cause nearby vegetation to combust.

f)      Hexane is a neurotoxic petroleum byproduct that can work its way into the food supply.

g)      Sodium alcoholate reacts violently with water.  In higher concentrations Sodium alcoholate with kill animal and plant life in the water.

h)      Chloride can be harmful the ecosystem in excessive levels by changing the salinity of the water.

42.      "Bilge Water" is water that regularly collects in the lowest parts, or bilges, of vessels, including OPI's fishing vessels.  Normal engine operation also results in oil residues accumulating in the bilges and mixing with the bilge water.  Under the Clean

Water Act, vessels such as OPI's are required to be equipped with equipment to both monitor oil levels and separate oil from the bilge water, as well as maintain records of certain operations and discharges of bilge water.

43.    "Refrigeration" or "Fish Water" is used by fishing vessels such as OPI's to keep the menhaden in fish holds refrigerated to avoid spoiling.    This water often accumulates fish waste such as scales, fins, and excrement.  Discharge of refrigeration water into United States waters is prohibited under the Clean Water Act unless done more than three nautical miles from shore.

## VI.    DEFENDANTS' FRAUDULENT INDUCEMENT.

44.    The United States, acting through the Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service ("NMFS"), administers the Fisheries Financing Program ("FFP").

45.    The FFP is a direct government loan program that provides long term financing for the cost of reconstructing fishing vessels and facilities to eligible U.S. companies.  The purpose of the FFP is to upgrade America's commercial fishing fleet in part because these upgrades would decrease the harms to the environment by aging vessels.

46.    As part of the FFP loan application process, each applicant is required to certify that it is in compliance with all applicable federal and state regulations, including environmental regulations.  This certification is a necessary pre-requisite to the United States' approval of the application and providing funds.

47.    On or about December 1, 2005, NMFS approved "in principle" a loan to OPI of $16,442,000.  This approval was amended on or about September 14, 2006.  The loan was divided into separate portions, or "tranches," and each tranche required a new

loan agreement.  Each tranche also required a separate request for disbursement from OPI to the United States, and a separate promissory note from OPI, which were guaranteed by OME.

48.    On or about November 5, 2009, NMFS approved OPI's request for the disbursement of a second tranche under the loan of $10,000,000.  NMFS and OPI closed the loan agreement for the second tranche on or about June 1, 2010.  As part of the loan agreement, OME guaranteed the second tranche under the loan for OPI.

49.    OPI submitted a false claim for, and fraudulently induced NMFS to agree to, the approval of the second tranche of $10,000,000.  OPI was not, and is not, in compliance with numerous environmental laws.  Yet, in the second tranche documents, OPI made a contractual representation that it was:

> [Not] in violation of, nor has [OPI] violated, in connection with the ownership, use, maintenance or operation of the Premises or the conduct of the business related thereto (including manufacturing, importing, processing, using, distribution, discharging, storing, treating and disposing of any substance) any applicable federal, state, county or local statute, law, regulation, rule, ordinance, code, license and permit of any and all governmental authorities relating to environmental matters, including, but not limited to, the Clean Air Act, the Federal Water Pollution Control Act of 1972, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Solid Waste Disposal Act, the Resource Conservation and Recovery Act and the Toxic Substances Control Act, and any amendments or extensions of the foregoing statutes, and all other applicable environmental requirements.

50.    This was not and is not a true statement, as detailed below.  Rather, OPI knowingly made these false representations in order to induce the NMFS to enter into the loan agreement and provide OPI the second tranche of $10,000,000.

51.    These representations were material to the NMFS's decision to enter into the loan agreement with OPI.  As a result of OPI's conviction for violations of the Clean Water Act regarding the discharge of oil and fish water into the United States' waters,

OME told its shareholders that "the convictions under the Clean Water Act will adversely affect the Company's ability to secure government contracts with the United States, and possibly, secure future loans under the NFMS [sic] Title XI loan program. The subsidiary has received notice from the EPA that it is ineligible, as a result of the convictions under the Clean Water Act, for receipt of government contracts or benefits if any part of the work will be performed at the facility where the offense occurred."

52.    Although OPI made these representations, OPI was, and is, a recidivist violator of federal and state environmental laws. As explained below, this conduct continues through today.

## VII.    OPI'S ENVIRONMENTAL VIOLATIONS

### A.    The Cameron Louisiana Violations

53.    On or about February 28, 2013, Louisiana's Department of Environmental Quality ("LDEQ") inspected OPI's processing plant in Cameron, Louisiana, which has since closed. LDEQ discovered "unauthorized discharge of fish oils to waters of the state" and "unauthorized discharge of diesel to the waters of the state." These discharges took place on or about July 21, 2009, August 27, 2009, and July 14, 2011.

54.    LDEQ's inspection of the Cameron plant on or about February 28, 2013, supplemented with a file review on or about November 7, 2013, identified 75 instances in which OPI exceeded its permitted discharge levels between April 2010 and March 2013. Each discharge LDEQ identified as exceeding the permitted levels at Cameron was a violation of OPI's permits and Louisiana Revised Statutes 30:2076(A)(3).

55.    OPI agreed to settle these allegations by paying a fine, but denied any wrongdoing.

### B.    The Reedville, Virginia Violations

56.    In June 2013, the United States alleged that OPI had knowingly discharged pollutants into U.S. waters without a permit on numerous separate and discreet occasions in violation of the Clean Water Act from vessels operating from its Reedville, Virginia plant.  The United States also alleged that OPI knowingly discharged oil into U.S. waters in potentially harmful quantities on numerous separate and discreet occasions in violation of the Clean Water Act.

57.    OPI resolved the United States' allegations by entering into a plea agreement in which it pleaded guilty to two counts of violating the Clean Water Act (one count of discharging pollutants on numerous occasions and one count of knowingly discharging harmful amounts of oil on numerous occasions).  Pursuant to the plea agreement, OPI was fined $5,500,000 and sentenced to three years of probation.

58.    Under the terms of OPI's probation, which remains in place until June 2016, OPI is required to:

a)    Pay $2,000,000 to the National Fish and Wildlife Foundation to fund projects to protect the Chesapeake Bay and enhance environmental compliance in the Chesapeake Bay watershed;

b)    Establish and Environmental Compliance System at all of its facilities, not just its Reedville, Virginia processing plant.  This system must include, at a minimum:

(1)    "Developing an environmental compliance manual covering general areas of federal, state and local environmental regulations, including management of industrial wastewater and hazardous waste; regulatory agency notifications in case of spills, releases, emissions or

discharges of pollutants into the environment; dealings with regulatory inspectors and personnel, and the importance of accuracy, timeliness and honesty in reporting to regulatory agencies all information required by the Clean Water Act and other federal and state environmental statutes, regulation, programs and permits."

(2)     "[A]ssure that there is a system in place under which its employees are made aware they can report allegations of environmental noncompliance to the appropriate federal, state and local regulatory agency, without fear of retribution."

(3)     "[S]et up a system for providing systematic training to new employees and refresher training for other employees on federal, state and local environmental statutes and regulations."

(4)     Agree to a third party monitor to review OPI's compliance with its environmental compliance at all of its facilities.

59.     Despite the Plea Agreement in Virginia, OPI has not stopped illegally discharging Bail and Fish Water, as well as oil, into United States waters in Louisiana without a permit.  Relator witnessed numerous instances of OPI unlawfully discharging bail water, fish water, and oil into the Vermilion River, at the direction of Abbeville Plant management.  Relator witnessed a number of other instances in which OPI dumped waste, including fish meal, fish oil, "pit" water, and sediment from the filtration pond onto the adjoining shoreline of the Vermilion River.  These discharges too were at the direction of Abbeville Plant management.

**C.**    **OPI's LPDES Permits do not Permit OPI's Discharges**

60.    OPI obtained a LPDES Permit that allows certain monitored discharges of pollutants from the Abbeville Plant.  OPI got a LPDES Permit for the Abbeville Plant on May 18, 2010, that was effective for 5 years.   OPI received a subsequent LPDES Permit for the Abbeville Plant on April 27, 2015 that remains effective (collectively "OPI's LPDES Permits").  Mr. Al Vidrine, the General Manager of the Abbeville Plant, is the individual responsible for water and solid waste discharges under the terms of OPI's LPDES Permits.

61.    Neither of OPI's LPDES Permits allows pollutant discharges from fishing vessels.  Instead, OPI's LPDES Permits are limited to specifically identified on-shore "outfalls."

62.    Neither Fish Water nor Bail Water are included among the permitted pollutants that OPI may discharge lawfully pursuant to OPI's LPDES Permits.  Further, OPI's LPDES Permits state: "There shall be no discharge of floating or senleable solids or visible foam in other than trace amounts, nor of free oil or other oily materials, nor of toxic materials in quantities such as to cause toxicity to aquatic organisms."

**D.**    **OPI Regularly Violates the Clean Water Act by Discharging Fish and Bail Water into the Vermilion River at the Abbeville Plant Without a Permit.**

63.    Once the Bail Water circulates through the Abbeville Plant for a period of time it becomes too thick to effectively circulate the fish any longer.  At that point, OPI pumps the Bail Water into storage tanks located at the Abbeville Plant.

64.    During menhaden season, however, the Bail Water generated exceeds the storage capacity of the tanks available.  When this happens, which may be right at the

start of the season, OPI continues to pump Bail Water into tanks that overflow, dumping Bail Water onto the ground. Relator witnessed this on a number of occasions.

65.    For example, on or about August 9, 2014, which was later in the 2014 menhaden season, Relator witnessed a large storage tank labeled "Bailwater Tank #31" overflowing Bail Water that was flowing off the top of the tank and falling to the ground. Similarly, on or about April 26, 2015, Relator witnessed Bail Water overflowing from "Bailwater Tank #9" and running down the sides of the tank onto the ground at the Abbeville Plant docks in close proximity to the Vermilion River.

66.    When the Abbeville Plant's storage tanks are full, OPI fishing vessels discharge their Fish Water directly into the Vermilion River while tied up at the Abbeville Plant because there is nowhere for them to properly offload it. These discharges of Fish Water from OPI's fishing vessels are not uncommon.

67.    According to the head bailer Julius, a.k.a. "Kingfish," the fishing boats do not dump their Fish Water more than three miles out because during fishing season the docks get backed up and the boat crews don't want their fish to spoil if they have to sit at the docks prior to unloading.

68.    On or about the evening of October 28, 2014, Relator witnessed OPI discharging Fish and/or Bail Water into the Vermilion River at the Abbeville Plant. This discharge produced a significant amount of white foam that covered the surface of the water that was easily visible from the Abbeville Plant docks.

69.    On or about the morning of April 20, 2015, which was one of the first days of the 2015 menhaden fishing season, all of the Bail Water tanks at the Abbeville Plant were already full. Marty Bush, who works on the OPI's water boat, explained to

Relator that OPI had sent the water boat to the shipyard and it was not in service to haul Fish Water or Bail Water out to sea to discharge.   As a result, there was nowhere to put the Fish or Bail Water and OPI would have to pump it into the Vermilion River.

70.    In fact, on or about the evening of April 20, 2015, OPI fishing vessels did pump their Fish Water out at the docks because there was nowhere for them to put it. This was because the Abbeville Plant facilities were full.  At the same time, OPI was also pumping Bail Water into the Vermilion River because the Abbeville Plant's storage tanks were full.

71.    On or about the evening of April 25, 2015, Relator witnessed OPI fishing vessel "Timbalier Bay" discharging its Fish Water into the Vermilion River while tied up to the docks at the Abbeville Plant.   F/V Timbalier Bay is owned and operated by OPI. While witnessing the Timbalier Bay discharging its Fish Water, Relator also witnessed a "big bubble" between two more docked fishing vessels that were discharging their Fish Water into the Vermilion River.  Relator boarded one of these two fishing vessels where a crewmember confirmed that they were discharging Fish Water at the time.  These two vessels were the F/V Raccoon Point and the F/V Atchafalaya Bay, both of which are owned and operated by OPI.

72.    On or about the early morning of April 26, 2015, Relator witnessed OPI pumping Bail Water into the Vermilion River, which produced large areas of white foam that was clearly visible on the surface of the river.   Later that morning, Relator witnessed OPI pumping Bail Water directly onto the ground at the Abbeville Plant docks.

73.    On or about the night of April 26, 2015 or early morning of April 27, 2015, OPI fishing vessels pumped their Fish Water into the Vermilion River at the

Abbeville Plant. While OPI's fishing vessels were pumping their Fish Water into the Vermilion River, OPI was also discharging Bail Water from the Abbeville Plant into the Vermilion River. According to the Head Bailer "Kingfish," because there was nowhere to store the Fish or Bail Water, OPI would either have to shut down or discharge the water into the Vermilion River. OPI refused to interrupt the Abbeville Plant's operations and chose to discharge the Fish and Bail Water into the Vermilion River.

74.     Discharges such as these are common and have been going on for years at the Abbeville Plant, including when OPI falsely induced the United States by asserting its compliance with environmental laws.

75.     OPI knows that these discharges violate federal environmental laws. As Kingfish, a long time OPI employee, explained to Relator, OPI fishing vessels are careful to discharge their Fish Water only at night to avoid getting caught by the Coast Guard. If OPI were to be caught, there would be a "big fine" and, perhaps, the Coast Guard would "shut the whole plant down."

###    E.    OPI Violates the CWA by Discharging Bail Water from its Water Boat Within 3 Nautical Miles of Land Without a Permit

76.     The Marine Protection, Research and Sanctuaries Act, 33 U.S.C. § 1401 *et seq.*, allows OPI to discharge Bail Water at sea as long as it is done outside of the United States' "territorial seas." The United States' territorial seas are defined as "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." 33 U.S.C. § 1362(8).

77.     OPI operates a "water boat," the Mermentau, that carries Bail Water from the Abbeville Plant into the Gulf of Mexico to discharge the Bail Water. It takes the

Mermentau approximately 7 to 8 hours to make the round trip from the Abbeville Plant to 3 miles offshore where it may discharge Bail Water, and then return to the Abbeville Plant.  At this pace, the Mermentau cannot remove enough Bail Water from the Abbeville Plant to keep up with the volume of Bail Water that needs to be removed.

78.     When the Mermentau cannot remove enough Bail Water to allow the Abbeville Plant to operate, OPI not only pumps Bail Water into the Vermilion River from the Abbeville Plant, but the Mermentau discharges Bail Water within the restricted waters (i.e. not 3 miles off shore).  For example, on or about the morning of April 8, 2015, Relator and OPI Supervisor Roosevelt Hudson spoke with Noah Daw, an OPI employee that was on the Mermentau that morning, who confirmed that they had not gone the required 3 miles from shore when they discharged the Bail Water that morning. According to Daw, they had left the Abbeville Plant around 4:30 a.m. and were back by 6:30 a.m.  Given the time it takes the Mermentau to get to the Gulf of Mexico, it was not possible that the Mermentau discharged the Bail Water far enough from shore.

**F.     OPI Discharged at Least 3,000 Gallons of Diesel Fuel into the Vermilion River and Lied to the Coast Guard to Cover it Up**

79.     On or about October 11, 2014, Relator was working his night shift at the Abbeville Plant.  At approximately 3 or 3:15 a.m., Relator exited the building he was working in and noticed a strong odor of diesel fuel coming from the Abbeville Plant docks.  Relator and others that also smelled the diesel went to the docks, where they saw a fishing boat named "Raccoon Point" overflowing diesel fuel into the Vermilion River. The F/V Raccoon Point is owned and operated by OPI.  OPI reported this incident to the U.S. Coast Guard as an accidental diesel oil spill of approximately 15-20 gallons.  The

Coast Guard issued a Letter of Warning to OPI dated November 13, 2014, but did not go to the Abbeville Plant to investigate the spill.

80.     OPI, however, falsely reported the quantity of diesel fuel pumped into the Vermilion River during the October 11, 2014 incident, and the reason it happened, because OPI knew that the Coast Guard would investigate the spill if OPI truthfully reported it.

81.     In fact, numerous OPI employees that were present during the diesel spill, including Relator, estimated that at least 3,000 gallons of diesel spilled into the Vermilion River on the morning of October 11, 2014.  Other OPI supervisors referred to the spill as "the Red Sea" because there was so much diesel fuel in the Vermilion River that morning.

82.     The October 11, 2014 diesel spill was not the result of an accident.  At approximately midnight on the morning of October 11, 2014, OPI supervisor Roosevelt Hudson signed a log book that indicated that Hudson was present for the refueling.  The refueling began at about midnight, and Hudson left the area.  The OPI crewmember that was fueling the Raccoon Point was intoxicated to the point that he passed out during the fueling.  Relator saw the crewmember stumbling around when Relator arrived at the docks to see the diesel fuel in the water.  OPI Supervisor Roosevelt Hudson told Glen Martin, the Abbeville Plant Manager, that the crewmember was intoxicated, yet OPI never tested the crewmember for alcohol or other substances.  OPI never punished the crewmember that fueled the Raccoon Point and caused the diesel spill on October 11, 2014.

83.     The Raccoon Point's Oil Record Book does not accurately reflect the amount of, actual circumstances of, or the actual reasons for the diesel spill on or about October 11, 2014.  The Raccoon Point displaces more than 400 gross tons and operates more than 12 miles from shore, which means that it must maintain an Oil Record Book. In the event of an accidental or exceptional discharge of oil, including diesel fuel, OPI must make an entry in the Oil Record Book stating "the circumstances of, and the reasons for, the discharge."  33 C.F.R. § 151.25(g).

84.     OPI failed to properly respond to the Diesel Spill on or about the morning of October 11, 2014.  Rather than try to contain the diesel fuel in the Vermilion River, OPI engaged the Raccoon Point's transmissions so that the propellers would spin and disperse the diesel fuel.  In an attempt to mask the diesel fuel in the Vermilion River, OPI pumped Fish Water into the river.  At no point did OPI try to contain the diesel fuel or remove it from the Vermilion River.

**G.     OPI Discharges Oil into the Vermilion River in Quantities Sufficient to Produce a Sheen on the Surface**

85.     In November 2014, just after the menhaden season ended, Joe Davis, the Abbeville Plant foreman, and Curt Mouton, an OPI employee, began to pump out the Abbeville Plant's filtration pond so that a contractor could dig out the sediment from the bottom of it.

86.     On or about December 8, 2014, Relator joined Joe Davis as he re-started this pumping because Mouton was on vacation at that time.  Relator accompanied Davis to the shore of the Vermilion River where the "Magic Pipe" discharged water from the filtration pond into the river.

87.     When Relator commented that the water coming from the filtration pond appeared black and smelled like black oil, Davis responded "that shit's nasty."  As the pumping of this water continued, Relator and Davis noticed that it was causing a visible sheen on the surface of the Vermilion River.   Davis then called Glen Martin, the Abbeville Plant Manager, to "let him make that call" whether to "shut it off or let it run." Martin met Davis and Relator at the shoreline to view the oil sheen himself.  Martin stated that "it's mixing well" and instructed Davis to continue the pumping even after Davis pointed out "the oil sheen coming on top."

88.     Once Martin left, Davis and Relator went to the filtration pond, where Davis started a portable, gas-powered pump that OPI was using to pump water from the filtration pond directly onto the ground adjacent to the pond (and in close proximity to the Vermilion River).   A few days later, Relator learned that OPI's safety staff ordered that the discharge from the "Magic Pipe" directly into the river had to be shut down because there was too much oil in it.  But Relator witnessed the portable pump continuing to run in January 2015 until the filtration pond was drained and the sediment removed.

89.     Relator also witnessed where at least some of the oil in the filtration pond came from.  OPI ships regularly discharge their Bilge Water into a storage tank at the Abbeville Plant.  On or about April 8, 2015, OPI pumped out water, which appeared black, from a Bilge Water holding tank into one of the pits, from which OPI pumped the Bilge Water into the filtration pond.  The water that OPI was pumping came from a 3,932 gallon tank labeled "Tank #37 Used Oil."

### H.     Problems with the Abbeville Plant's Filtration Pond

90.     OPI's LPDES Permits require OPI to "at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances)

which are installed or used by the permittee to achieve compliance with the conditions of this permit." OPI has not properly operated and maintained the filtration pond at the Abbeville Plant.

91.     The filtration pond is required to have a liner to prevent pollutants from seeping out into the groundwater and the Vermilion River. When the pond was built, it had a plastic liner. But gas bubbles formed that caused the liner to rise and clog the filtration system's pumps, at which time OPI cut out the liner to prevent it from interfering with the pumps. Although OPI removed the liner from the middle of the pond, it left the liner "all around the sides" and "just on the edges" so that it appears that there is a liner from the surface. The liner was cut out and removed when Tom Whitman was the General Manager of the Abbeville Plant and Al Vidrine was a supervisor. Al Vidrine has been the General Manager of the Abbeville Plant since approximately 1998 or 1999, meaning the filtration pond's liner was cut out and removed before then.

92.     On one occasion, oil balls that resembled "golf balls" formed in the filtration pond. Wayne, OPI's "environment man" at the Abbeville Plant, took some photographs of these oil balls and sent them to his superior in Reedville, Virginia. When Al Vidrine found out about this, he "was mad" and told Wayne "don't tell them son-of-a-bitches nothin'." Vidrine also directed Wayne not to send anything that didn't go through him first.

93.     As a result of the photographs being sent to Virginia, Davis was directed to pump fresh water into the filtration pond to try and dilute the water in it. Wayne also called the OME headquarters in Houston about the problems with the filtration pond at

the Abbeville Plant, but OME told him to "leave it alone" if Vidrine said to leave it alone, which he did.

94.     In March or April, 2015, OME's company-wide Environmental Director from Virginia, Bill Purcell, convened a meeting at the Abbeville Plant, attended by Relator and other Abbeville Plant employees.  Purcell used the photos of the Abbeville Plant filtration pond that Wayne had sent to him in a slide show during the meeting. When a photograph of the Abbeville Plant's filtration pond went on the screen, Mr. Purcell stated that "something is wrong with the pond."

### I.     OPI Regularly Dumps Pollutants onto the Adjoining Shoreline of the Vermilion River

95.     Just before the beginning of the 2014 menhaden season, on or about April 17, 2014, Relator joined Joe Davis (the Abbeville Plant Foreman) and Curtis Mouton (an OPI employee) in cleaning out one of the Abbeville Plant's "pits."  The pits are designed to capture and store plant runoff, including Bail Water, Bilge Water, caustic chemicals, and other kinds of liquids used at the plant pending disposal or pumping into the filtration pond.  Prior to each menhaden season, OPI cleans the pit by pumping large volumes of water through it and suctioning it into a large tanker truck.

96.     Davis and Mouton explained that Al Vidrine and Glen Martin had told them to dump the pit water in a field adjacent to the Abbeville Plant, even though this liquid is supposed to be hauled to a processing facility and disposed of.  Davis also stated that this liquid is getting into the drinking water because of where OPI is dumping it.   In reality, OPI simply drives the waste just off the Abbeville Plant grounds and dumps it into a field.   According to Mouton, this started happening "after that hurricane."   The

last hurricanes that hit Louisiana in the Abbeville area were Hurricanes Katrina and Rita in 2005.

97.    After they finished cleaning out the pit, Relator accompanied Curtis Mouton as they followed the tanker truck loaded with the pit water as it went to dump it in the field next to the Abbeville Plant.  This was the second time that morning (April 17, 2014) that the tanker had dumped pit water in the field.  The tanker drove just off the Abbeville Plant and backed down a dirt road into a field to dump the pit water.   Once there, Curtis Mouton opened a valve on the back of the tanker truck and black liquid began to flow out onto the ground.  This dumping took place approximately 150 feet from a creek feeding the Vermilion River.  As the liquid was being dumped onto the ground, the truck driver (an employee of a contractor) asked Relator to sign a manifest form indicating that the water had been sent to a third party disposal facility.   Relator refused to sign it.

98.    The fact that this is an annual practice at the Abbeville Plant was confirmed to Relator by the truck driver, a contractor's employee, that drove the tanker truck on or about April 17, 2014.  The truck driver explained that for years he had been hauling waste into the field adjacent to the Abbeville Plant and dumping it there rather than taking it to his employer's facility in Morgan City, Louisiana for disposal.  This includes fish oil, dead fish, pit water, and other waste from the Abbeville Plant.

99.    Relator subsequently went back into the field next to the Abbeville Plant and observed both white foam and a visible oil sheen originating on the shoreline where OPI dumps its waste and extending out into the water.

**J.     OPI Falsifies Training Records**

100.    OPI supervisors often joke about falsifying documents regarding environmental training for the Coast Guard.   This is despite the fact that OPI's probation requires the implementation of training programs and the making of truthful statements to the government.   Relator, among others, was told to sign attendance documents for training that was never provided.

**K.     The Court Appointed Monitor**

101.    As part of OPI's Plea Agreement and Probation, a court-appointed monitor from Martin-Ottaway (the "Monitor") audits OPI's facilities each year.   These audits are ineffective because they are announced and scheduled in advance.   Throughout Relator's employment at OPI, he observed that it was OPI's regular practice to clean up the facility in advance of these audits.   This included pumping fresh water into its filtration pond to dilute it when oil balls became an issue.   Further, if there were fishing vessels that might draw attention from the Monitor, OPI instructed those fishing vessels to stay at sea during the audit, which occurred during fishing season.

102.    The Monitor's audits are limited in their scope.   For example, during the 2014 audit of the Abbeville Plant, the audit consisted of a review of OPI's documentation and records.   The Monitor went onboard only three vessels.   But the monitor did not inspect any of the boats that Relator witnessed discharging Fish Water into the Vermilion River.   Nor did the monitor inspect the records on these vessels or the Raccoon Point, which Relator witnessed discharging the 3,000 gallons or more of diesel fuel into the Vermilion River.

### L.    Relator's Attempts to Report OPI's Violations

103.    OME's Code of Business Conduct and Ethics, which applies to OPI employees as well, states that employees are to call the "24-hour Omega Protein Ethics Hotline" to report "possible violations of law."  Employees are "assured that their concerns will be taken seriously and will be promptly investigated," and that "[t]he individual raising the concern, and all who are affected, will be treated fairly and protected from retaliation."

104.    On March 16, 2015, and again on March 17, 2015, Relator called Omega's ethics hotline on four separate occasions to report a series of thefts and the environmental violations taking place at the Abbeville Plant.  Nothing ever happened as a result of these telephone calls.

105.    Also in March 2015, Relator contacted both federal and state officials to report OPI's conduct at the Abbeville Plant.  Relator called the Federal Bureau of Investigations in Louisiana, the Occupations Safety and Health Administration, and the Louisiana Attorney General's Office.

106.    OME's CEO, Bret Scholtes, personally toured the Abbeville Plant between April 16 and April 20, 2015, to determine that it was ready for the menhaden season and for purposes of viewing an equipment upgrade at the plant.  Relator spoke briefly with Scholtes about the theft of Omega property by numerous employees and managers, including Al Vidrine, at the Abbeville Plant.  As a result of this conversation, Monte Deihl, OME's V.P. of Operations, met with the Relator to discuss the alleged thefts at the Abbeville Plant.  Deihl arranged for Relator to meet with OME's Human Resources staff, who questioned  Relator regarding his OME hotline reports concerning

thefts and environmental violations at the Abbeville Plant. OPI thereafter fired the Relator in June of 2015.

## COUNT I
## VIOLATIONS OF THE  FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

107.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

108.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

109.    By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment under the second tranche of the FFP loan to which it was not entitled.  Defendants knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

110.    Each claim presented or caused to be presented for payment under the loan agreement challenged herein represents a false or fraudulent claim for payment under the FCA.

111.    Unaware that Defendants submitted false statements to conceal its misconduct, and unaware that Defendants routinely violated federal environmental laws and regulations and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States entered into the agreement to pay the second tranche under the FFP loan and paid the false claim submitted for the second tranche under Defendants' FFP loan.  The United States would not have entered into the loan agreement for the second tranche and this claim would not have been paid but for Defendants' fraud and false statements.

112.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States entered into the loan agreement for the second tranche and has paid said claim and has suffered financial losses as a result of these acts by Defendants.

### COUNT II
### VIOLATIONS OF THE  FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

113.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

114.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

115.    By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims to induce the United States to enter into the loan agreement for the second tranche under the FFP loan, to which Defendants were not entitled.  Defendants knew that the records and statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the records and statements, or acted in reckless disregard for whether the records and statements were true or false.

116.    Each false or fraudulent record or statement material to a false or fraudulent claim for payment under the FFP loan challenged herein represents a false or fraudulent claim for payment under the FCA.

117.    Unaware that Defendants submitted false records or statements to conceal the its misconduct, and unaware that Defendants routinely violated numerous federal environmental laws, including the Clean Water Act and the Act to Prevent Pollution from Ships, and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States entered into the loan agreement for the second tranche and paid the false claims submitted for Defendants' FFP loan.  These claims would not have been paid but for Defendants' fraud and false statements.

118.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendants.

## COUNT III
## VIOLATIONS OF THE  FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)

119.    Relator restates and realleges the allegations contained in the preceding

paragraphs as if each were stated herein in their entirety and said allegations are

incorporated herein by reference.

120.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part

that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

121.    By virtue of the acts described herein, Defendants conspired to commit

violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to

be presented, false or fraudulent claims for payment by knowingly making, using, or

causing to be made or used, false records or statements material to false or fraudulent

claims.  Defendants knew that these claims were false, fraudulent, or fictitious, or were

deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for

whether the claims were true or false

122.    Unaware of the conspiracy to submit false records and/or statements to

conceal their misconduct, and unaware that Defendants routinely violated numerous

federal environmental laws, including the Clean Water Act and the Act to Prevent

Pollution from Ships, and falsely certified compliance with laws and regulations despite

pervasive and substantial non-compliance, the United States agreed to enter into the loan

agreement for the second tranche and paid the false claims submitted for the second tranche under the FFP loan. This claims would not have been paid but for Defendants' fraud and false statements.

123.    In reliance on the accuracy of Defendants' statements, records, data, representations, and certifications, the United States agreed enter into the loan agreement for the second tranche and have paid said claims.

## PRAYER AS TO COUNTS I-III

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Counts I-III, respectively, as follows:

a.    Damages in the amount of three times the actual damages suffered by the United States Government as a result of each Defendants' conduct;

b.    Civil penalties against the Defendants, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.    The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b);

d.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.    Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.    Relator's individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

**COUNT IV**
**VIOLATIONS OF THE  CLEAN WATER ACT (AGAINST OPI)**
**33 U.S.C. § 1365(a)(1)**

124.     Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

125.      Under the Clean Water Act, a private citizen may bring an action against any person that is alleged to be in violation of an effluent standard or limitation under the CWA.  Thus, the private citizen may bring an action on his own behalf against a person that discharges pollutants from a point source into the navigable waters of the United States without a permit.

126.     The Clean Water Act provides that without a permit, "the discharge of any pollutant by any person shall be unlawful."  The CWA applies to the navigable waters of the United States.

127.     Defendant OPI regularly discharges Fish Water from its fishing vessels into the Vermilion River while they are tied up at the Abbeville Plant docks without a permit.  Fish Water is a pollutant that is unlawful to discharge into the navigable waters of the United States without a permit.

128.     The Clean Water Act defines the "navigable waters" to mean "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  The Vermilion River is part of the navigable waters of the United States.

129.    While in the navigable waters of the United States, OPI's fishing vessels are a point source for pollutants.

130.    OPI does not have a NPDES or LPDES permit that allows OPI's fishing vessels to discharge their Fish Water into the Vermilion River.

### COUNT V
### VIOLATIONS OF THE CLEAN WATER ACT (AGAINST OPI)
### 33 U.S.C. § 1365(a)(1)

131.    Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

132.    Under the Clean Water Act, a private citizen may bring an action against any person that is alleged to be in violation of an effluent standard or limitation under the CWA.  Thus, the private citizen may bring an action on his own behalf against a person that discharges pollutants from a point source into the navigable waters of the United States without a permit.

133.    The Clean Water Act provides that without a permit, "the discharge of any pollutant by any person shall be unlawful."  The CWA applies to the navigable waters of the United States.

134.    Defendant OPI regularly discharges Bail Water from its water boat, the Mermentau, into the navigable waters of the United States without a permit, including the territorial seas and the Vermilion Bay.  Bail Water is a pollutant that is unlawful to discharge into the navigable waters of the United States without a permit.

135.    The Clean Water Act defines the "navigable waters" to mean "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  The Vermilion Bay and the territorial seas are part of the navigable waters of the United States.

136.    While in the navigable waters of the United States, OPI's water boat is a point source for pollutants.

137.    OPI does not have a permit that allows OPI's water boat to discharge Bail Water into the navigable waters of the United States.  Because the water boat does not travel beyond the territorial seas to discharge its Bail Water, the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. § 1401 *et seq.*, does not authorize these discharges.

**COUNT VI**
**VIOLATIONS OF THE  CLEAN WATER ACT (AGAINST OPI)**
**33 U.S.C. § 1365(a)(1)**

138.    Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

139.    Under the Clean Water Act, a private citizen may bring an action against any person that is alleged to be in violation of an effluent standard or limitation under the CWA.  Thus, the private citizen may bring an action on his own behalf against a person that discharges pollutants from a point source into the navigable waters of the United States without a permit.

140.    The Clean Water Act provides that without a permit, "the discharge of any pollutant by any person shall be unlawful."  The CWA applies to the navigable waters of the United States.

141.    Defendant OPI regularly discharges Bail Water from the Abbeville Plant into the Vermilion River without a permit.  Bail Water is a pollutant that is unlawful to discharge into the navigable waters of the United States without a permit.

142.    The Clean Water Act defines the "navigable waters" to mean "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  The Vermilion River is part of the navigable waters of the United States.

143.    The Abbeville Plant is a point source for pollutants.

144.    OPI does not have a permit that allows the Abbeville Plant to discharge Bail Water into the Vermilion River.  OPI's LPDES Permits prohibit OPI's discharges because the permits prohibit any discharge that generates a white foam on the surface of the water other than in trace amounts.

## COUNT VII
## VIOLATIONS OF THE  CLEAN WATER ACT (AGAINST OPI)
### 33 U.S.C. § 1365(a)(1)

145.    Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

146.    Under the Clean Water Act, a private citizen may bring an action against any person that is alleged to be in violation of an effluent standard or limitation under the CWA.  Thus, the private citizen may bring an action on his own behalf against a person that discharges pollutants from a point source into the navigable waters of the United States without a permit.

147.    The Clean Water Act provides that without a permit, "the discharge of any pollutant by any person shall be unlawful."  The CWA applies to the navigable waters of the United States.

148.    Defendant OPI regularly discharges harmful quantities of oil from the Abbeville Plant's filtration pond into the Vermilion River without a permit.  Oil is a

pollutant that is unlawful to discharge in quantities that may be harmful into the navigable waters of the United States without a permit.

149.    Under the Clean Water Act, oil is considered to be "in such quantities as may be harmful" when it "cause[s] a film or sheen upon or discoloration of the surface of the water." 40 C.F.R. § 110.3.

150.    The Clean Water Act defines the "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).  The Vermilion River is part of the navigable waters of the United States.

151.    The Abbeville Plant is a point source for pollutants.

152.    OPI does not have a permit that allows the Abbeville Plant to discharge oil into the Vermilion River in such quantities as may be harmful.

## PRAYER AS TO COUNTS IV-VII

WHEREFORE, Plaintiff prays that this District Court enter judgment on behalf of Plaintiff and against Defendant in Counts IV-VII, respectively, as follows:

a.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

b.    Injunctive or other relief requiring Defendants to cease their violations of the Clean Water Act; and

c.    All other relief on behalf of Plaintiff to which he may be justly entitled, under law or in equity, and the District Court deems just and proper.

## COUNT VIII
## VIOLATIONS OF THE  ACT TO PREVENT POLUTION FROM SHIPS
## (AGAINST OPI)
### 33 U.S.C. § 1910(a)

153.     Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

154.     Under the Act to Prevent Pollution from Ships, "any person having an interest which is, or can be, adversely affected, may bring an action on his own behalf— (1) against any person alleged to be in violation of the provisions of this chapter, or regulations issued hereunder."

155.     OPI's fishing vessel Raccoon Point displaces more than 400 gross tons and operates more than 12 miles from shore.  The F/V Raccoon Point is required to maintain an Oil Record Book.

156.     OPI knowingly failed to maintain an accurate Oil Record Book for the F/V Raccoon Point when OPI made a false, fictitious, or fraudulent entries regarding the October 11, 2014 diesel fuel spill.  These false, fictitious, or fraudulent statements included the size of the spill and the causes of it.

## COUNT IX
## VIOLATIONS OF THE  ACT TO PREVENT POLUTION FROM SHIPS
## (AGAINST OPI)
### 33 U.S.C. § 1910(a)

157.     Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

158.     Under the Act to Prevent Pollution from Ships, "any person having an interest which is, or can be, adversely affected, may bring an action on his own behalf—

(1) against any person alleged to be in violation of the provisions of this chapter, or regulations issued hereunder."

159.     APPS requires the person in charge of a ship of United States registry, wherever it is located, or of a sea port subject to United States jurisdiction to report any discharge or probable discharge of oil.

160.     OPI knowingly failed to truthfully and accurately report the October 11, 2014 diesel fuel spill by making false, fictitious, or fraudulent statements to the United States Coast Guard regarding the size of the spill and the causes of it.

## PRAYER AS TO COUNTS VIII-IX

WHEREFORE, Plaintiff prays that this District Court enter judgment on behalf of Plaintiff and against Defendant in Counts VIII-IX, respectively, as follows:

a.     All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

b.     The fair and reasonable sum to which Plaintiff is entitled under 33 U.S.C. §§ 1908(a)-(b);

c.     Injunctive or other relief requiring Defendants to cease their violations of the Act to Prevent Pollution from Ships; and

d.     All other relief on behalf of Plaintiff to which he may be justly entitled, under law or in equity, and the District Court deems just and proper.

## COUNT X
## LOUISIANA ENVIRONMENTAL WHISTLEBLOWER STATUTE
### La. Rev. Stat. § 30:2027

161.     Plaintiff restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

162.    Louisiana's Environmental Whistleblower Statute prohibits employers from taking adverse actions against employees who in good faith report suspected environmental violations to their superiors.

163.    Plaintiff reported OPI's continuous and systematic violations of federal and state environmental laws to his superiors at OME and OPI through OME's designated hotline.  When OME did not respond to his calls, Plaintiff spoke directly to OME's Chief Executive Officer Bret Scholtes, who arranged for OME's Vice President of Operations Monte Deihl to talk with Plaintiff.  Plaintiff met with OME's human resources staff following his report of environmental violations taking place at the Abbeville Plant.

164.    Following Plaintiff's reporting of the environmental violations at the Abbeville Plant, OPI terminated his employment.

165.    OPI terminated Plaintiff because he reported the environmental violations at the Abbeville Plant to his superiors.

## PRAYER AS TO COUNT X

WHEREFORE, Plaintiff prays that this District Court enter judgment on behalf of Plaintiff and against Defendants in Count X, respectively, as follows:

a.    Damages in the amount of three times the actual damages suffered by the Plaintiff as a result of Defendants' conduct;

b.    All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

c.    Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law; and

d.    All other relief to which Plaintiff may be justly entitled, under law or in

equity, and the District Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Relator demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil

Procedure and the Seventh Amendment to the U.S. Constitution.

Dated: March 16, 2016.


Respectfully submitted,

_s/ Edward Meyers____
Andrew M. Beato (*pro hac vice* pending)
Edward H. Meyers (*pro hac vice* pending)
Jed Wulfekotte (*pro hac vice* pending)
Stein Mitchell Cipollone Beato & Missner LLP
1100 Connecticut Avenue, N.W., Suite 1100
Washington, DC 20036
Tel: (202) 737-7777
Fax: (202) 296-8312

and

_s/ Robert Landry___
Robert B. Landry, III, LA # 18998
Robert B. Landry III, PLC
5420 Corporate Boulevard, Suite 204
Baton Rouge, LA  70808
Tel: (225) 349-7464
Fax: (225) 349-7466

*Counsel for Relator/Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on this 16th day of March, 2016, a true and correct copy of the

foregoing Complaint has been served via U.S. Certified Mail, Return Receipt Requested,

upon the following parties:

> The Honorable Loretta Lynch
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Washington, DC  20530-0001
>
> Stephanie A. Finley
> United States Attorney
> Western District of Louisiana
> U.S. Attorney's Office
> 800 Lafayette Street, Suite 2200
> Lafayette, LA  70501-6832

> _s/ Edward Meyers____
> Edward Meyers